1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | . | Criminal No. 1:12cr38-1 |
| | . | |
| vs. | . | Alexandria, Virginia |
| | . | February 16, 2012 |
| KURAYE TAMUNOIBI AKUIYIBO, | . | 3:02 p.m. |
| | . | |
| Defendant. | . | |
| | . | |

. . . . . . . . . . .

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE T. RAWLES JONES, JR.
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE GOVERNMENT:     KIMBERLY R. PEDERSEN, AUSA
                        United States Attorney's Office
                        2100 Jamieson Avenue
                        Alexandria, VA 22314


FOR THE DEFENDANT:      PAT M. WOODWARD, JR., ESQ.
                        Woodward Law Group
                        1783 Forest Drive, Suite 330
                        Annapolis, MD 21401
                          and
                        KENNETH W. RAVENELL, ESQ.
                        PAULA XINIS, ESQ.
                        Murphy PA
                        One South Street, Suite 2300
                        Baltimore, MD 21202


TRANSCRIBER:            ANNELIESE J. THOMSON, RDR, CRR
                        U.S. District Court, Fifth Floor
                        401 Courthouse Square
                        Alexandria, VA 22314
                        (703)299-8595


                  (Pages 1 - 18)


(Proceedings recorded by electronic sound recording, transcript
 produced by computerized transcription.)

                                                                    2

1                    P R O C E E D I N G S

2                       (Defendant present.)

3           THE CLERK:  United States v. Kuraye Akuiyibo, Case
4    No. 12cr38.
5           MS. PEDERSEN:  Good afternoon, Your Honor.  Kim
6    Pedersen for the United States.
7           THE COURT:  Good afternoon.
8           MR. WOODWARD:  Good morning, Your Honor -- good
9    afternoon, Your Honor.  Pat Woodward, local counsel.
10          MR. RAVENELL:  Good afternoon, Your Honor.  For the
11   record, Ken Ravenell and Ms. Xinis on behalf of Mr. Akuiyibo,
12   who is present.
13          THE COURT:  Good afternoon.  Just one moment.
14          We're here for further consideration of bail.
15   Mr. Ravenell, have you-all received and had a chance to review
16   the government's formal motion and the memorandum in support of
17   detention?
18          MR. RAVENELL:  We have received it and reviewed it,
19   Your Honor, and if I need to respond to the cases, Ms. Xinis
20   could do that.
21          THE COURT:  All right.  Before we get to that, what's
22   the status of the title reports?
23          MR. RAVENELL:  I have a package, Your Honor.  We have
24   presented one to the government.  May I approach with one for
25   the Court?

3

1    THE COURT: You can give it to Ms. Marquez, please.
2    MR. RAVENELL: Thank you.
3    THE COURT: I'll take a moment to look at it.
4    MR. RAVENELL: Yes.
5    THE COURT: All right, I've looked at the
6  declarations. I've not studied the reports further than that.
7  I want to take things one step at a time.
8    Ms. Pedersen, do you want to present anything --
9  other than argument, do you want to present anything beyond
10 what's in the memorandum?
11   MS. PEDERSEN: No, Your Honor.
12   THE COURT: All right. Mr. Ravenell, do you wish to
13 present additional evidence?
14   MR. RAVENELL: Your Honor, the only additional
15 evidence we have is another affidavit. We did mention to the
16 Court that, that there was a gentleman who was, worked at one
17 of the locations where Mr. Akuiyibo had lived in New York and
18 that that person had alerted him that the FBI, in fact, had
19 came -- come by the day before looking for him. We have a
20 declaration from that gentleman that I present on the issue
21 of --
22   THE COURT: Do you want to hand that to the marshal,
23 please?
24   MR. RAVENELL: And a copy for the government.
25   THE COURT: All right, I think the best way to

1  proceed under the circumstances is since Mr. Ravenell has not
2  had a chance to prepare a written response to the government's
3  memorandum, I'll let you respond to that orally, Mr. Ravenell,
4  and then I'll hear Ms. Pedersen further and then anything else
5  that, that the defense wants to add.
6         MR. RAVENELL:  Thank you, Your Honor.  Ms. Xinis will
7  respond to the memorandum.
8         THE COURT:  Very well.
9         MS. XINIS:  Good afternoon, Your Honor.
10        THE COURT:  Good afternoon.
11        MS. XINIS:  Your Honor, if I may just briefly discuss
12 the government's cases, I think they break down on two rules,
13 one of which we agree, and that's just with respect to the
14 standard that's before the Court.  While this is a presumption
15 case, we agree with the government that they carry the ultimate
16 burden, and that's the burden of persuasion.
17        So I think about this as we've lobbed the tennis ball
18 over on their side, and unless they hit it back, we carry the
19 day, and every case that the government cites basically stands
20 for that proposition, but that's where the agreement begins and
21 ends.
22        I think beyond that, when we unpack the cases that
23 the government cites, they're as different as, you know, it's
24 not apples and apples.  It's apples and dump trucks, because
25 none of them really here address the case before this Court

1   with Mr. Akuiyibo, which is like night and day.

2           And I'll just quickly go over the cases that we have
3   here.  *Wright* is the only case that I have found cited in this
4   circuit.  It's a Fourth Circuit case.  It's a 1973 case, and it
5   was authored by Judge Widener.  It's probably most notable for
6   the fact that it was the largest to date cocaine drop in
7   Baltimore City.  It was a $7.5 million deal done, which was a
8   tremendous amount of money back in 1973.  It's, it's still an
9   incredible amount of money.

10          And the issue before the Court for the Fourth Circuit
11  was whether that defendant, who was actually released on a
12  $250,000 property bond, should be kept to that same property
13  bond.  So it wasn't even a case in which the defendant was
14  detained and then seeking appeal to reverse that detention
15  order.  It was indeed the defendant was released.  He just
16  wanted a lesser bond, and the bond in that case, if I'm doing
17  the math right -- and forgive me if I'm not, because I'm a
18  lawyer for a very good reason; I was never really good at
19  math -- is about 3 percent of the actual dollar value of the
20  case in 1973.

21          Certainly that case stands for the proposition that
22  the package we've presented to the Court of all electronic
23  monitoring, 24-hour lockdown with GPS, no computer access, no
24  cell phone access, essentially replicating prison in a very
25  suitable third-party custodian's home, address any issue with

6

1  respect to flight and danger.

2        Second, with respect to the case that the Court --
3  that the government cites as to family members and friends
4  posting bond as -- and other, and other restrictions of a
5  person's liberty pretrial going to anything other than risk of
6  flight, the government cites to a Second Circuit case,
7  *Mercedes*. *Mercedes* is interesting because in that case, the
8  Second Circuit found, well, perhaps property bonds and
9  electronic monitoring in that case doesn't speak to danger, but
10 they actually left open the question of whether it could, and I
11 think Your Honor need not reach that, but it's an interesting
12 exercise when in this case we would suggest having four
13 individuals, family members, two of whom -- one is
14 Mr. Akuiyibo's brother, the other is his aunt, and close, close
15 friends posting property actually speaks to the issue of danger
16 in this way:

17       When you have individuals who know Mr. Akuiyibo well,
18 who have been raised with him, who have helped raise him, and
19 they say, "I am putting my family's roof in Mr. Akuiyibo's
20 hands," that speaks to his character.  That speaks to their
21 belief in him and his trustworthiness.

22       And so in that situation, Your Honor, I think it does
23 speak to danger, because if the government comes back and says
24 there is an issue of danger, you can look to a person's
25 character, we submit, as saying there really isn't, but what's

7

1  even more notable about --
2         THE COURT: I am more worried about flight than I am
3  about danger at this point given what appears to me to be the
4  defendant's inability to pursue further the activities that
5  he's charged with having pursued in the past.
6         MS. XINIS: And what's notable, Your Honor, about
7  these cases is that they make clear that the way we've
8  addressed flight would reasonably assure Mr. Akuiyibo's
9  appearance in court, because again, these cases also make clear
10 the standard is not absolute assurance, where everybody would
11 be detained, but reasonable assurance; and *Mercedes*, *Abad,* and
12 *Bailey*, the other cases that the government cites, really have
13 nothing to do with this one.
14        In *Mercedes*, we had a band of gang members,
15 codefendants, thwarted by agents, stopped from robbing other
16 drug dealers.  When they were arrested, found in their car were
17 loaded handguns, badges from -- actual law enforcement badges,
18 and cuffs, because they were going to stage this heist as if
19 they were law enforcement.  Could not be more different from
20 Mr. Akuiyibo's case.
21        Similarly with *Bailey*, we have an individual who is
22 part of an L.A. gang, comes to Kansas City with 307 -- 4,700
23 grams of crack, has two prior convictions for guns, no ties to
24 the area, is on probation at the time of the offense, certainly
25 nothing to do with Mr. Akuiyibo's case.

8

1     We have no allegation of real firearms.  We have
2 allegations which are quite old and substantial ties and
3 support given to this Court to assure -- reasonably assure his
4 appearance in court, unlike *Bailey*.
5     In *Bailey*, to, to counter all of those indicia of
6 flight, substantially more serious allegations, the only piece
7 of property that was put up in *Bailey* was, I believe, a single
8 home, where here we have four, and unlike *Bailey*, we have a
9 number of other factors that would reasonably assure
10 Mr. Akuiyibo's appearance for this Court.
11     We have, unlike *Bailey*, electronic monitoring with
12 GPS.  We have no computers and no cell phones, which unlike
13 *Bailey*, which I believe was a 1990 case, where they weren't
14 nearly in the same electronic age that we find ourselves in
15 today, clipping a person's wings by not allowing them the same
16 cell phone and computer access certainly would keep them and
17 keep this Court far more reassured that they will appear when
18 they're supposed to, because they have no means to do any of
19 the acts that the government has referenced should be at all a
20 danger, and they're not in this case.
21         THE COURT:  How do you respond to the government's
22 concern and, in all candor, the Court's concern about the large
23 amounts of alleged unaccounted for cash in this case?
24         MS. XINIS:  Well, Your Honor, in a number of ways.
25 One is if we look at the allegations in this case -- and again,

9

1  they're only allegations, and as Your Honor knows best, they're
2  the factor to be considered given the least weight of all.
3          THE COURT: They are allegations, but the grand jury
4  has now found probable cause, which counts for something.
5          MS. XINIS: I think the way that we've addressed it,
6  Your Honor, is to cut off at every turn any access to that
7  alleged cash, assuming it exists. And we have, we have a
8  number of coconspirators. We have an allegation which is
9  conclusory at best of that amount. We really don't have any
10 steps taken in the indictment to tell us how we get to that
11 number, but assuming even that number exists, what we are
12 proposing is a total lockdown, a lockdown in Mr. Esi's home.
13         So if we think of the ways in which an individual
14 would come into large cash, we don't have those ways here. We
15 don't have access to a computer where transactions can take
16 place. We don't have access to a Smartphone. We don't even
17 have access to an unsupervised ability to make a call, because
18 all of those transactions couldn't take place under the package
19 that we've presented to the Court.
20         In addition, Your Honor, if we're looking at
21 reasonable assurance of appearance by Mr. Akuiyibo to this
22 court, what he is risking is far greater than what we presume
23 is out there because of the indictment. What he is risking by
24 not coming to court, Your Honor, is the family home of his
25 brother, is the family home of his aunt, who is his maternal

10

1  aunt, meaning his mother's sister, and from what I understand
2  from the Akuiyibo family, that is -- has been a family home for
3  20 years, as Your Honor sees from the, the title report.
4      Ms. Ibiteyin Myers has had that home since 1993.
5  She's a single mother.  She -- her son lives there; her
6  grandchildren live there; her nephew lives there.  So
7  Mr. Akuiyibo would be risking two family homes.
8      In addition, two other close friends and family
9  members have put up their properties.  We have four reasonable
10 assurances that Mr. Akuiyibo would not flee.
11     So when you contrast that with, albeit an allegation,
12 that a grand jury has found probable cause with, simply the
13 weight is in favor of the defendant.  It's in favor of
14 Mr. Akuiyibo; and at this point, Your Honor, we would suggest
15 we've hit that tennis ball over hard; and the government can't
16 return the volley.
17     THE COURT:  All right.
18     MS. XINIS:  They simply can't return the burden of
19 persuasion.
20     THE COURT:  Then the ball is in Ms. Pedersen's court.
21     MS. PEDERSEN:  Judge, to address your concerns about
22 flight, at the bottom -- at the end of the day, basically the
23 defendant's word can't be trusted.  At his arrest in New York,
24 he told Pretrial Services what he thought was going to benefit
25 him, and that information turned out not to be true.

11

1        Like I argued last Monday, he neglected to disclose
2   foreign travel presumably because he thought if he disclosed
3   it, it would look like he would be a risk of flight.  He
4   indicated that he had lived in his D.C. address since 2006, but
5   really that house has been abandoned.  He's not failed -- I'm
6   sorry, he's failed to live up to his legal obligation, his
7   contractual obligation to pay the mortgage on that property
8   despite having ample assets from his illicit business.
9        The defendant indicated he'd been self-employed since
10  2004 importing and exporting cars he sold at auction.  However,
11  the bank account for this Boyton LLC company for which he
12  claimed to be self-employed wasn't open at the Bank of America
13  until May of 2011.
14       The large amounts of unaccounted for cash include --
15  this business was generating $3,000 cash per night, every
16  night.
17       The defendant has a great incentive to flee in this
18  case, Your Honor.  I know you're not as concerned about the
19  danger, but let me just point out that there are two separate
20  charges for 924(c)'s, or two separate incidents, one in
21  September of 2009, one in September of 2010, two separate
22  victims, two separate locations, two separate incidents.
23       A gun has not been recovered at all through different
24  searches of four of the properties associated with the
25  defendant.

1        The strength of the government's case in this matter
2   is overwhelming, and I think that combined with the amount of
3   time he's facing and the fact that his word can't be trusted
4   when it benefits him should cause the Court to have serious
5   concerns about releasing and finding that these properties
6   don't rebut all of the concerns that the Court should have or
7   the statutory presumption, and he should be detained.
8        THE COURT:  Thank you.
9        MR. RAVENELL:  Your Honor, let me -- I'm sorry.
10       THE COURT:  Go ahead, Mr. Ravenell, and then I'm
11  going to take a brief recess and review the submissions.
12       MR. RAVENELL:  Sure.  Just briefly, one of the things
13  that the government ignores is that my client, our client
14  actually was employed, Judge, at AOL for about three years.
15  Before that, he was at UUNet for about three years after he
16  left George Mason.
17       And the government tells you that you should look at
18  this lack of disclosure of foreign travel.  Well, if you'll
19  recall, what the government said when we were here before was
20  that, well, he told Pretrial about some of his foreign travel
21  but not all of his foreign travel and that somehow by telling
22  Pretrial about some but not all of his foreign travel, he was
23  doing that because he really had a plan that if he told them
24  about all of the foreign travel, that they would somehow find
25  that he was a risk of flight.

1          Well --

2          THE COURT: I'll spot him the travel, Mr. Ravenell.

3          MR. RAVENELL: Thank you, Your Honor.

4          THE COURT: But the misrepresentations about his
5  residence, which I understand your position on that but I don't
6  yet agree with it, and misrepresentations about his employment
7  are of some concern.

8          MR. RAVENELL: Well, Your Honor, what the government
9  has said is that he -- they don't have any evidence in a bank
10 account that he, in fact, was buying and selling cars. That's
11 what you heard from the detective.

12         If you'll recall, I asked him about what he's
13 referring to, whether they would have any evidence of actual
14 purchases of vehicles, if there are vehicles purchased, for
15 example, at Manheim, which is where he went, Manheim in
16 Pennsylvania, which is where most people go to purchase these
17 vehicles when they're buying vehicles from Manheim and they're
18 reselling them, these are cash transactions, the fact that cash
19 that went into the account, and the agent simple said: We saw
20 cash going into the account.

21         And he admitted that if these are cash purchases and
22 cash sales, that there is nothing about that account would
23 indicate that he, in fact, was not involved in purchasing and
24 selling vehicles.

25         So the government hasn't presented any evidence that

14

1   he gave false information, that he was involved in that, those
2   transactions as well. They are alleging that he was involved
3   in some illegal activity. One day, some jury will make that
4   determination, but that doesn't mean that he was not also
5   involved in buying and selling cars, and they have introduced
6   no evidence that tells you differently.
7        To suggest that because he didn't pay the mortgage on
8   the premises, that means that he somehow doesn't what, he
9   doesn't own it? Yes, he owns it.
10       What we do know is that even when his brother met
11  with Pretrial, his brother made clear -- this is Mr. Ekine
12  Akuiyibo -- well, that his brother had the place still in
13  Washington but actually had a location where he was living with
14  his girlfriend and his fiancee actually in New York.
15       There is no secret, Judge, that the government has
16  been watching my client now for some time. They were
17  monitoring his travels. He wasn't hiding the fact that he was
18  in New York. He was there, and they knew he was there.
19       And what adds to this, Judge, is that what the
20  government cannot rebut is that he knew they were looking for
21  him at least 24 hours in advance, and he didn't flee. And no
22  one else has come before this Court, they can say all they
23  want, can say that, that this man knew, and if he wanted to be
24  on a plane and out of the country, if he had all the dollars
25  they say he had, the $4 million in cash, and he wanted to be

15

1  gone with it, then why would he stay and wait?

2          And the following day, when he received a tip that
3  the police had arrested other coconspirators, alleged -- that
4  the government alleged were coconspirators, he didn't leave
5  again.

6          So talk about the desire to stay and fight these
7  charges?  He made that decision before they came upon him,
8  Judge, and there's nothing to suggest that now that he's hired
9  counsel to fight this matter, that he's going to do something
10 different.

11         He knew that there was a potential of being detained.
12 Anyone knows that the federal court, knows there's a potential
13 of being detained.  Yet he didn't flee the jurisdiction.

14         The government says that the gun has not been
15 recovered.  Well, you may recall the testimony, you know, from
16 the agent, and I won't belabor the point, because quite
17 frankly, Judge, what was recovered appears to be the gun that
18 was in question, which was not a real gun.  Their own witness
19 told them that the item that was recovered and the agent told
20 you looks pretty much like what the alleged victim told you was
21 present when he was involved in a fistfight with my client.

22         Judge, this is a situation that actually cries out
23 for the Court to obviously review the paperwork we've presented
24 to you.  Once you've done that, we'd be happy to answer any
25 question the Court has.

16

1            There are affidavits, there are two affidavits with
2    each one of the individuals' property, Judge, you know, one
3    that addresses their relationship to the property and one that
4    we got today just to address some of the questions that were
5    raised -- or issues raised by the government about whether my
6    client has $4 million, whether he's going to pay these people,
7    you know, so that they can lose their homes and then he can
8    refund the monies to them.
9            And these affidavits, we got them very quickly,
10   because when we saw this motion, memorandum, we wanted to give
11   the Court as much as we could on short notice to address those
12   issues as well.
13           We'll be happy to answer any questions.
14           THE COURT:  Thank you.  I'll take a brief recess.
15              (Recess from 3:24 p.m., until 3:30 p.m.)
16                        (Defendant present.)
17           THE COURT:  The Court finds that there's no
18   combination of conditions of release that would reasonably
19   assure either the defendant's appearance or the safety of the
20   community.  His ties to this community and his family ties are
21   completely outweighed in the Court's view by the strength of
22   the evidence against him -- the nature of the offense and the
23   strength of the evidence against him, the fact that the minimum
24   advisory guideline is as high as it is, his ties to a foreign
25   country, the misrepresentations that I find he did make and

1  intentionally made to the Pretrial Services officer after his
2  arrest about where he resided and the nature of his employment,
3  and certainly not least, the large amount of cash that is
4  unaccounted for and which might very well be available to him
5  if he had planned it that way, notwithstanding home detention
6  or any other condition that the Court might fashion.
7            On those findings, he'll be held without bail, and
8  he's remanded into the marshal's custody.
9            MR. RAVENELL:  Your Honor, if I could address one
10 issue with the Court?
11           THE COURT:  Yes, sir.
12           MR. RAVENELL:  Okay.  Right now, Mr. Akuiyibo is
13 being held in segregation, and the reason he is there, we're
14 told, is that some reason somehow when the agents input his
15 information into the computer system, they show that he is
16 involved in offenses that involve prostitution with minors.
17           Now, we brought this to the government's attention, I
18 think, either late last week or early this week, and
19 Ms. Pedersen has made at least one call over to the detention
20 center.  The problem is that I have been told that maybe our
21 client has to put in for an appeal to try to correct something
22 that he didn't cause.  Because he's in segregation, he's locked
23 up 23 hours a day.
24           So I'd ask the Court to -- whatever the Court can,
25 I'm not sure how the Court would address this, but this

1    information --
2            THE COURT:  I think you need to file a motion,
3    Mr. Ravenell.  My -- the entire Court's general approach is
4    that matters involving the place and manner of detention are
5    within the marshal's purview, but if, if there is a problem of
6    the sort that you're describing and if that is, in fact, the
7    reason for a misclassification, then I think a motion is the
8    way to go about it, and you can address that motion to me.
9            MR. RAVENELL:  We will do that, Your Honor.  Thank
10   you.
11           THE COURT:  Thank you.
12           All right, the defendant is remanded, and Court's in
13   recess.
14                           (Which were all the proceedings
15                            had at this time.)
16
17                    CERTIFICATE OF THE TRANSCRIBER
18      I certify that the foregoing is a correct transcript from
19   the official electronic sound recording of the proceedings in
20   the above-entitled matter.
21
22                                       /s/
                                    Anneliese J. Thomson
23
24
25