**IN THE UNITED STATE DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 1:12-cr-0038 |
| v. ) | |
| ) | The Honorable Leonie M. Brinkema |
| KURAYE TAMUNOIBI AKUIYIBO, ) | |
| ) | Sentencing: August 2, 2012 |
| Defendant. ) | |

**DEFENDANT'S POSITION WITH RESPECT TO SENTENCING**

COMES NOW the defendant, KURAYE AKUIYIBO, by and through counsel, and in accordance with 18 U.S.C. § 3553(a) and § 6A1.2 of the United States Sentencing Guidelines ("U.S.S.G."), respectfully submits to this Honorable Court his position with respect to sentencing. In support of his position, Mr. Akuiyibo offers the following:

**I.  MR. AKUIYIBO'S PRESENTENCE REPORT AND GUIDELINES CALCULATIONS**

On May 16, 2012, Mr. Akuiyibo pled guilty to one count of Conspiracy to Commit Money Laundering (18 U.S.C. § 1956), one count of Conspiracy to Travel/Use Interstate Facilities in Aid of a Racketeering Enterprise (18 U.S.C. § 1952 and § 371) and one count of Violence in Aid of Racketeering (18 U.S.C. § 1959(a)(3)). United States Probation Officer, Karen Moran, calculated Mr. Akuiyibo's guidelines as a level 24, which provides for a recommended sentencing range of fifty-one (51) to sixty-three (63) months in jail. Mr. Akuiyibo agrees with Ms. Moran's guideline calculations. Furthermore, per the written plea agreement, both parties have agreed to recommend a sentence of fifty-one months.

Mr. Akuiyibo raised several objections to factual allegations and representations made by other individuals regarding Mr. Akuiyibo's conduct. Several of Mr. Akuiyibo's objections were

accepted by the probation officer and those portions of the Presentence Investigation Report ("PSR") were removed or amended. Regarding the remaining objections, the probation officer included footnotes indicating those allegations Mr. Akuiyibo denied. Mr. Akuiyibo asked that those objections be included in the PSR because of the impact those allegations could have on his designation and incarceration if they were left unrebutted. Mr. Akuiyibo includes for this Court's review his original letter containing his objections. *See* Attachment 1 (provided without the accompanying attachment containing e-mail conversations between C.A. and Mr. Akuiyibo).

## II. NON-GUIDELINE SENTENCING CONSIDERATIONS

The Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, now requires district courts to consider both the U.S.S.G. range and all the factors contained in 18 U.S.C. § 3553(a) when calculating a criminal defendant's ultimate sentence. District courts are instructed to first correctly calculate the guideline range and then consider the factors in § 3553(a) to determine whether a sentence within the guideline range is appropriate or whether a variance from the guideline range is warranted. *Gall v. United States*, 128 S.Ct. 586, 596 (2007). There is no presumption of reasonableness attached to the guideline range nor is there a presumption of unreasonableness to a non-guideline range sentence. *See id.* at 596-97. At the conclusion of considering the guideline range and § 3553(a) factors in relation to the facts of the case, "the court shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of § 3553(a).

In the instant case, in accordance with Mr. Akuiyibo's agreement with the government and for the reasons that follow, we submit that a sentence of incarceration for a period of fifty-one (51) months is sufficient but not greater than necessary to address the § 3553(a) sentencing

factors. Those factors expressed in § 3553(a) and information relevant to their analysis are discussed below.

### A. Nature and Circumstances of the Offense

The nature and circumstances of the offense are largely reflected in the PSR's Offense Conduct section as well as the Statement of Facts accompanying Mr. Akuiyibo's plea agreement. However, Mr. Akuiyibo presents here further information regarding his offense that is not included within the PSR or Statement of Facts. Particularly, Mr. Akuiyibo offers more detail regarding the onset of his criminal behavior and the context in which it occurred for this Court's consideration in fashioning his sentence.

As evidenced in the PSR, Mr. Akuiyibo began operating an escort service in late 2008 early 2009 in the Washington, D.C., metro area. Mr. Akuiyibo created Classy DC Escorts ("Classy") by following an online blueprint for creating escort agencies. Classy operated similarly to many escort agencies in that it involved the offering of sex by various consenting adult women in exchange for payment by customers or "johns."

Mr. Akuiyibo would place advertisements online announcing the presence of his agency and seeking women interested working with Classy in D.C. and eventually elsewhere. The very nature of the escort business in today's world is that most women who seek to make a living this way prefer to do so in locations far away from where they reside. Therefore, women from other parts of the country would seek to travel to D.C. and elsewhere for short trips and then return home or travel on to another city. These trips are commonly referred to as "tours."

Agencies such as Classy provide a service to women engaged in prostitution in that they allow the women to partner up with a service that has better knowledge of the local market, an established local client or customer base and familiarity with the best hotels and locations within

which to set up appointments. Importantly, partnering up with an agency relieves the women of having to book appointments and verify that the customers are legitimate and not law enforcement. The local agencies would also have some record or knowledge of those customers who were problematic or failed to pay the negotiated rates and would be aware of who the woman was meeting with and their location.

In exchange for the agencies' services, the women would generally agree to split the proceeds of their hourly rate with the agencies at a rate of 60% to the women and 40% to the agency. This was a standard split in the escort industry. In addition, the agencies and the women would negotiate the splitting of airfare and hotel rooms, with those costs often being split 50/50. When a woman partnered up with an agency and agreed to a travel date, the agency would then book the hotel room and purchase the airline ticket for the woman. At least in Mr. Akuiyibo's case, the hotel confirmations and flight information were sent via e-mail. Once the woman arrived in the metro area, she would travel to the selected hotel and begin to see clients. The agency would correspond with the women and the clients in order to advise them of the time of their appointments and the women's room number at the hotel.

The johns would pay the women directly at the beginning of their appointment and a member of the agency would travel to the various hotels every evening to collect the agency's proceeds for the day. Once a woman's tour was complete, she would check out of the hotel and travel onto her next tour or return home. If the trip was lucrative, the women would often arrange to come back into town a few weeks or months later and repeat the process.

There are many different ways in which an escort service or prostitution business can be run. At one level, there is street level prostitution where women engage previously unknown or unverified men on the street and agree to engage in sex in a local hotel room, car or other

location. In this scenario, almost no one would be aware of the woman's location or who she was meeting with. There are also services that operate almost as indentured servitude in that an agency owner will often transport illegal aliens into the country and require them to work as a prostitute until they have paid off the cost of their transport, housing, etc. Similarly, there are organizations, often associated with gang activity, that entice and promote the prostitution of minors in exchange for drugs, housing and other benefits. These organizations are often characterized by extreme violence against the women and overall abusive conduct including forcing women to continue with prostitution against their will.

On the other end of the spectrum are more upscale escort services, like Classy, that cater to high paying customers that seek a more discrete transaction and a more sophisticated operation.[1] These services are almost always consensual, are less likely to include physical violence, and are very lucrative for both the women and the agencies. Some of the more well known agencies to have been prosecuted in recent history include the Emperors Club VIP in New York and Miami Companions, which was based out of Florida but was prosecuted in Michigan, that boasted thousands of clients, charged rates in excess of $1,000 an hour, and have included famous clients such as professional athletes and government officials. Though not on the scale of the Emperors Club or Miami Companions, Classy operated as a high end escort service and did not share the characteristics of the more serious or dangerous businesses referenced above.

This is not to suggest that Classy was any less illegal than other escort agencies but it is important to understand and appreciate how Classy was operated. Prostitution is not a one size

---

[1] Many of Classy's customers were lawyers and other professionals.

fits all designation and the manner in which the business operated is an important consideration in fashioning an appropriate sentence.

As indicated in the PSR and in Mr. Akuiyibo's Statement of Facts, it is true that Mr. Akuiyibo has confronted women who he believed had absconded with Classy's money. Mr. Akuiyibo's actions were inexcusable and showed a disregard for the impact his actions had on the women. However, despite Mr. Akuiyibo's regrettable conduct, he did not ever actually hurt any of the women who worked for him and those incidents that did occur are the exceptions to how he ran Classy and not the rule. The truth is, it is simply part of the prostitution business that many women will attempt to shortchange the agency, particularly when one of their tours did not generate the type of proceeds they were expecting. The women base their decision to travel on their trust that the agency will make their tour and efforts profitable. In return, the agency trusts that the women will turn over the agency's proceeds before traveling to their next destination.

Nevertheless, this business, for all the money it generates for those who partake in it, still involves considerable mistrust between partners and both agencies and prostitutes are often trying to increase their profit margin by skimming money off the top of expenses or in the case of some of the women, leaving town without paying the agency fees. To that end, agencies such as Mr. Akuiyibo's sometimes threaten or communicate a willingness to confront women who steal from the agency in order to prevent or limit future losses. But in this case, those empty threats never materialized to actual physical violence and both of the women Mr. Akuiyibo confronted in this case never paid the money he believed he was owed and neither ever heard from him again after the initial confrontation. Similarly, it was almost inevitable that women who partnered up with the agency on one or more tours would eventually try out another agency

if they thought there was more money to be made. Classy was not immune to this and for the most part Mr. Akuiyibo accepted this fact as part of doing business.[2]

It is true, however, that Mr. Akuiyibo did physically assault one of his employees, Kobla Fiagbedzi, in part because of his belief that Fiagbedzi was trying to undercut Classy and begin his own agency. Mr. Akuiyibo acknowledges that he lost his cool after confronting Fiagbedzi. The two of them had a complicated relationship where in addition to working on Classy, they also spent considerable time and resources trying to build other businesses, including an online furniture wholesale business. Mr. Akuiyibo often provided money to Fiagbedzi to further their plans but they never seemed to materialize.

On the other hand, Mr. Akuiyibo was also loyal to Fiagbedzi and continued to employ him as a collector even though he was unreliable and often used these excursions to sleep with the women working with Classy. Mr. Akuiyibo even continued to employ Fiagbedzi after he learned of Fiagbedzi's attempts to organize a competing agency. Moreover, when Fiagbedzi's mother had to be hospitalized, Mr. Akuiyibo gave him more than $10,000.00 so that he could pay his mother's medical expenses.

In sum, Fiagbedzi was more than just someone Mr. Akuiybo worked with. Mr. Akuiyibo also considered him a friend and trusted him with intimate knowledge about Classy, more so than anyone else. Given the background of the relationship, Mr. Akuiyibo was particularly offended by Fiagbedzi's plans. The altercation with Fiagbedzi had been brewing for some time and it came to a head during their fight. Mr. Akuiyibo confronted Fiagbedzi and initiated a fight

---

[2] One recorded call obtained via wiretap between Mr. Akuiyibo and Opuiyo on September 18, 2011, offers some support in that Mr. Akuiyibo advises Opuiyo that there is nothing they can do if a woman wants to leave and work with another agency, it is simply up to the women who they decide to work with.

that did not last for very long but during which both he and Fiagbedzi sustained minor injuries. Likewise, while being separated by Asuen, Mr. Akuiyibo grabbed a laptop power cord from an outlet and swung it at Fiagbedzi. The fight was broken up and the two men settled their differences. Fiagbedzi continued to collect money for Classy that very evening and beyond.

This is all not to say that Mr. Akuiyibo is entitled to any leniency from the Court at sentencing because he could have run Classy in a more abusive or hostile manner. Certainly Mr. Akuiyibo is deserving of serious punishment for the manner in which he did operate Classy regardless of whether it could have been more or less troubling. Rather, Mr. Akuiyibo submits that his actions and behavior are adequately accounted for by the Guidelines and support the joint recommendation.

### B. History and Characteristics of the Defendant

Mr. Akuiyibo is a young man with much of his life still ahead of him. He is a relatively young offender and apart from minor infractions has no significant prior criminal history. Mr. Akuiyibo was born in the United States but soon moved to Nigeria where he was raised in a loving home. He grew up in a close nuclear and extended family as evidenced by the letters submitted by his friends and relatives. *See* Attachment 2 (Letters).[3]

Prior to the instant offense he was a law abiding citizen who demonstrated a passion for life and a commitment to hard work and caring for his family. Mr. Akuiyibo was granted a great opportunity by his family when he was sent to the United States to finish high school and obtain his college education. He made the most of that opportunity by excelling in school and embarking on a promising career. His early days in the United States were also challenging in

---

[3] All of the letters submitted on Mr. Akuiyibo's behalf have been consolidated into one attachment. Though only a few letters are mentioned directly in this memorandum, the Court is invited to read all of the letters that were submitted.

that in addition to supporting himself, Mr. Akuiyibo also had to contribute at a young age to the well being of his brothers who had also traveled to the U.S. for school and were entrusted into his custody. As his brother, Dumo, recounts, "I remember one time when we ate oatmeal sans milk three times a day, for 2 days because he had spent his money on textbooks and had not yet gotten paid." *See* Attachment 2 (Letter from Dumo Akuiyibo). Mr. Akuiyibo would also lighten his school schedule at times in order to devote more time to work and to provide for his brothers. Due to those sacrifices, Mr. Akuiyibo did not obtain his college degree until 2006.

That Mr. Akuiyibo made those sacrifices is not surprising given the letters submitted on his behalf. If nothing else, Mr. Akuiyibo has exhibited tremendous generosity towards his friends and relatives and has always made a point of maintaining a presence in their lives. Mr. Akuiyibo was a constant source of support both financially and emotionally for his sister who is divorced and struggled to take care of her two children, one of whom suffers from a disability. His sister Owualata, or Lata as she is known, tells of how Mr. Akuiyibo wanted her to move with her children to the U.S. so he could help support them and after she declined would still pay for her and the children to fly to the United States from London to visit with their family here. *See* Attachment 2 (Letter from Owualata Egonu).

Given his background and reputation, it is also not surprising that Mr. Akuiyibo hid his escort business from his friends and family. Not only did his choices stand in sharp contrast to his upbringing and his family's religious values, it was completely inconsistent with the career route of almost everyone in his family. One of the most striking aspects of the letters submitted on Mr. Akuiyibo's behalf is his family's incredible educational and career accomplishments. His family, both men and women, carry engineering, medical and business degrees among others. They are ministers, lawyers, doctors, dentists, engineers and legislators. As the parents of Mr.

Akuiyibo's sister-in-law note, the Akuiyibos' dedication to education and giving back to the community "has been part of the family culture for three generations. This is what we love about our son-in-law. This is what we love about his family. This is the community that looks forward to Kuraye's return." *See* Attachment 2 (Letter from Helen and Scott Rodde). Put simply, this is an impressive family, which makes Mr. Akuiyibo's actions in this case all the more disappointing.

In addition to the letters that have been submitted, undersigned counsel has spent many hours in meetings with Mr. Akuiyibo's family and discussing both him and this case. Those meeting have been held with Mr. Akuiyibo's mother, who traveled from Nigeria, his sister who traveled from London, and his brothers who have traveled from Houston and San Francisco. There have also been many phone calls with relatives from around the United States and Nigeria. It is evident from those conversations that Mr. Akuiyibo's family cares deeply for him and will do whatever they can to assist him upon release. They have also been remarkable for the genuine understanding and belief his family has that Mr. Akuiyibo must be punished for what he has done and that he must make amends for his actions to society, God and his family.

Mr. Akuiyibo was on track at one point to add another impressive résumé to his family's accomplishments. He was successful, making a decent living and the sky was the limit for him. But despite his accomplishments, Mr. Akuiyibo was still immature and in many ways was free for the first time from the burden of providing for and caring for his younger brothers.[4] Like many people, both young and old, he began to measure success by money. Always wanting to

---

[4] *See* Attachment 2 (Letter from Ekine Akuiyibo) ("We had the support of our family but this was the first time we were away from the majority of them and fending for ourselves. I will not speculate what effect this had on him but the effect on me was that I was suddenly thrust into the role of father figure; I was only 22. I don't think even Kuraye understands or appreciates the implications of such a sudden life change; he was just 17.").

open his own business, be his own boss and make his own schedule, Mr. Akuiyibo began his search for a profitable business. Blinded by the potential profits and low start up costs of an escort business, he began to walk the road that would lead him to prison at age 32.

There can be no doubt that Mr. Akuiyibo was corrupted by the lure of money, cars and an extravagant lifestyle. The escort business provided him the opportunity to jet set between N.Y. and Miami and have virtually anything he wanted. He wasted his money at nightclubs and on clothing, alcohol and drugs and spent it almost as soon as he got it. He mingled with the rich and famous and accumulated expensive wardrobes and $40,000.00 watches. He played the part and admittedly enjoyed every second of the lifestyle the escort business afforded him.

But in the end it has left him in prison for the foreseeable future. He will have nothing to show for the past four years of his life other than three felony convictions, an almost insurmountable debt to the government and incredible shame and guilt. His college degree and prior work history will carry less influence with future employers than will his criminal record. He will have nothing of his own upon release other than his family and friends.

Despite all this, for which he is entirely responsible, there are reasons for this Court to be optimistic that Mr. Akuiyibo, perhaps more so than many other defendants in his situation, can succeed upon release and continue on the path he was traveling before his greed and desires led him astray. For one, Mr. Akuiyibo is well educated and is not averse to hard work. Second, Mr. Akuiyibo is fortunate to have a vast and accomplished support network. Third, depending on the Court's sentence, it is likely that Mr. Akuiyibo will still be relatively young upon his release. Finally, Mr. Akuiyibo has admitted his guilt and has cooperated with law enforcement, including agreeing to testify against any of his co-defendants had any of them proceeded to trial. These factors suggest that Mr. Akuiyibo has accepted responsibility for his behavior and given his

situation and characteristics, he will have the opportunity to lead a productive and law abiding life upon his eventual release.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

We submit that the recommended sentence in this case is sufficient to reflect the seriousness of the offense, promote respect for the law and to provide just punishment for Mr. Akuiyibo's behavior. Fifty-one months is a considerable amount of time to be incarcerated, particularly for a first time offender. The Court should also consider the seriousness of these felony convictions and the lengthy term of imprisonment they carry by understanding that the underlying offense which was being promoted by the use of interstate facilities and money laundering is, in the places where it occurred, a misdemeanor offense. Solicitation of prostitution in Virginia, Maryland and D.C. are misdemeanor offenses that often result in only probationary or deferred dispositions. The mere fact that a woman involved in prostitution traveled across a state line in order to carry out the misdemeanor offense with the assistance of an agency, however, converts that misdemeanor to a significant felony under federal law. Unlike drug trafficking, gambling, fraud and other types of racketeering activities, sex itself is, obviously, not inherently illegal. It only becomes illegal when it is obtained through the exchange of money and even then it is a misdemeanor unless it involves interstate travel or the use of interstate facilities.

It is also fair to consider that the women who partnered with Classy did so of their own volition and many if not most had been prostitutes long before encountering Classy and still continue to prostitute today albeit with different agencies. At least one of the government's cooperating witnesses (CS-1) has been arrested since the instant indictment for prostitution and

has even been advertising her "tours" to the D.C. area during the pendency of this matter while she was expected to be a witness at trial. This does not minimize Mr. Akuiyibo's culpability or the harm prostitution can have on the community and the women who participate in it, but it supports a finding that the fifty-one month sentence called for by the guidelines is sufficient to accomplish the goals of sentencing. Moreover, we submit that in the context of this case, the five-level increase in Mr. Akuiyibo's guideline level for the travel of more than five women during the course of the conspiracy, where the travel was undertaken consensually by the women themselves, is sufficient to promote respect for the law and provide adequate punishment for the offense.

### D. Afford Adequate Deterrence to Criminal Conduct and Protect the Public From Future Crimes of the Defendant

As mentioned above, we submit that there is little reason to believe that Mr. Akuiyibo will again resort to criminal behavior in the future. Mr. Akuiyibo has strong ties to his family who play an active role in his life and will look after him upon his release from incarceration. In addition to the support of his family and friends, Mr. Akuiyibo has previously demonstrated an ability to be a law abiding citizen and to be an accomplished worker. If given the opportunity, there is no reason to believe that Mr. Akuiyibo will not be successful in whatever field he pursues upon release. Importantly, Mr. Akuiyibo feels tremendous guilt and shame over the harm he has caused and is committed to again living a life he and his family can be proud of.

### E. The Need to Provide the Defendant with Needed Education or Vocational Training, Medical Care, or Other Correctional Treatment

As reflected in the PSR and in this memorandum, Mr. Akuiyibo committed himself fully to leading a reckless lifestyle during the course of this conspiracy, including abusing alcohol and drugs. While he is reluctant to term his abuse as an addiction, it is clear that Mr. Akuiyibo

developed an unhealthy dependence on alcohol and drugs. Mr. Akuiyibo would often drink to the point of intoxication four to five times a week and was even arrested for public intoxication a month before his arrest in this case. He often supplemented his intoxication through the use of ecstasy, a popular and dangerous drug often associated with the nightclub scene. While perhaps Mr. Akuiyibo's substance abuse is not as overwhelming as other defendants who have been before this Court, we believe Mr. Akuiyibo would benefit tremendously from the Bureau of Prison's Residential Drug Abuse Program ("RDAP") and respectfully request that the Court make such a recommendation in its Final Order.

### F. The Need to Avoid Unwarranted Sentencing Disparities

The jointly recommended sentence would avoid any unwarranted sentencing disparities in this case. For reasons that likely vary significantly from case to case, defendants in two recent cases who have pled guilty to travel act and money laundering charges related to escort agencies have received sentences substantially below that recommended in the instant case. The head of the Emperors Club VIP escort service in New York (made famous for its inclusion of Eliot Spitzer among its clients) received a sentence of thirty (30) months, despite running an international operation that generated enough proceeds for him to have almost $1,000,000.00 cash in his home at the time of his arrest. *See United States v. Mark Brener*, Case No. 08cr533 (S.D.N.Y. 2009).[5] The head of Miami Companions received a sentence of fourteen (14) months after admitting to running an escort service that operated throughout the United States, listed over 30,000 clients, booked more than 100 appointments a day, set up a call center in Panama to lower costs and avoid detection and on occasion involved the transport of illegal aliens for the

---

[5] The government recommended a sentence within the Guideline range of 24-30 months.

purpose of prostitution. *See United States v. Gregory Carr*, Case No. 2:10cr20400 (E.D. Mich. 2011).[6]

Needless to say, there are likely various reasons for why Brener and Carr received relatively low sentences, as compared to Mr. Akuiyibo's guidelines, despite their extensive criminal conduct. For one, the government did not seek, and the courts did not impose, certain enhancements that both Mr. Akuiyibo and the government have agreed to here, such as the five-level enhancement for the transportation of more than five women and the two-level increase for sophisticated laundering. Moreover, the final pleas entered in the Carr and Brener cases did not include any counts or allegations of violence or threats to do the same. For that reason, the Carr and Brener cases are only of limited value to this Court's decision. However, we submit that given the sentences imposed in those two cases, the recommended sentence in the instant case is sufficient but not greater than necessary to account for Mr. Akuiyibo's behavior, when all of his acts are considered.

Likewise, we acknowledge that Mr. Akuiyibo must and will receive the longest sentence of all the defendants in this case. Although Mr. Akuiyibo and Asuen were similarly situated in their respective agencies, the fact is that this investigation was targeted against Mr. Akuiyibo and produced the most evidence against Classy. We submit that the recommended sentence will give this Court ample room to fashion sentences for the remaining co-defendants without creating any unwarranted disparity.

---

[6] The probation office had calculated a Guideline range of 41-51 months. The government and the defense, however, had recommended a Guideline range of 21-27 months in the plea agreement and the government ultimately requested a sentence of 27 months.

WHEREFORE based on the foregoing reasons and any others that may appear to the Court or that may develop at the sentencing hearing we respectfully request that this Honorable Court sentence Mr. Akuiyibo in accordance with the joint recommendation in this case.

Respectfully submitted,

KURAYE AKUIYIBO,
By Counsel

_____/s/_____
Stuart Alexander Sears
Va. Bar No. 71436
ZWERLING, MOSELEY & SEARS, P.C.
114 N. Alfred Street
Alexandria, Virginia 22314
Ph: 703-684-8000
Fax: 703-684-9700
Stuart@zwerling.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of July, 2012, I electronically filed a true copy of the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties.

/s/
Stuart Alexander Sears
Va. Bar No. 71436
ZWERLING, MOSELEY & SEARS, P.C.
114 N. Alfred Street
Alexandria, Virginia 22314
Ph: 703-684-8000
Fax: 703-684-9700
Stuart@zwerling.com